<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————————
|                          | x |
| BAKER,                   | x |   Hon. Stanley R. Chesler, U.S.D.J.
|            plaintiff,    | x |
|                          | x |   Civ. No. 03-2600
| v.                       | x |
|                          | x |   **OPINION**
| ALLEN, et al.,           | x |
|                          | x |
|            defendants.   | x |
————————————————————————x

<u>CHESLER, District Judge</u>

Plaintiff, Timothy Baker, an inmate at South Woods Prison in New Jersey, has sued South Woods prison administrators, corrections officers, a third-party medical services provider, its employees, and another inmate under 42 U.S.C. § 1983 and various state law theories. Plaintiff claims damages against these defendants for failure to protect him from an assault by another inmate and failure to provide medical attention for injuries sustained during the assault. Defendants have filed three separate summary judgment motions.

First, defendants Correctional Medical Services, Inc., ("CMS Inc.") Daniel Schroeder, Kimberly Jenkins, Rita Manigault and Jack Nugent (collectively the "CMS Defendants") move for summary judgment and dismissal of plaintiff's claims [Docket Entry No. 77], arguing (1) there is no evidence they acted with "deliberate indifference"; (2) there is no evidence of the deprivation of a constitutional right under <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); (3) the CMS defendants cannot be vicariously liable under <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658 (1978); (4) plaintiff has not exhausted administrative remedies; and (5) plaintiff

1

cannot establish negligence.  Second, defendants John S. Terhune[1], Susan Maurer, and Stanley

Nunn (defendants Maurer and Nunn shall be referred to as the "DOC Defendants") move for

summary judgment [Docket Entry No. 78], arguing (1) plaintiff has not alleged any personal

action by defendants and Section 1983 liability cannot be premised on a theory of vicarious

liability; (2) they are entitled to qualified immunity; and (3) they are entitled to absolute

immunity pursuant to N.J.S.A. 59:5-1.  Third, defendant Sergeant Lewis Dutton moves for

summary judgment [Docket Entry No. 80], arguing (1) he is entitled to qualified immunity; and

(2) plaintiff failed to file a notice of tort claim under N.J.S.A. 59:8-1 et seq.; (3) plaintiff's claims

are barred by the immunity conferred upon him by N.J.S.A. 59:5-1(b)(4); (4) plaintiff has

sustained no permanent injury under N.J.S.A. 59:9-2(d); and (5) plaintiff cannot couch his state

law claim as a "Constitutional Tort" under the New Jersey State Constitution does not deprive

defendant of his immunity.

For the reasons that follow, the CMS Defendants' motion is **GRANTED IN PART AND**

**DENIED IN PART**, the DOC Defendants' motion is **GRANTED** as to all claims against them,

and defendant Dutton's motion is **GRANTED IN PART AND DENIED IN PART**.

I.      **FACTS**

        A.      **Background**

        On or about May 16, 2001, plaintiff Timothy Baker was sentenced to a five-year prison

term and, in July 2001, he entered the custody of the New Jersey Department of Corrections

("DOC").  (Plaintiff's Third Amended Complaint ("Complt.") at ¶ 21.)  In August of 2001,

---

[1]In his opposition brief, plaintiff concedes he is not seeking damages against defendant
Terhune (Opposition Brief ("Opp. Br.") at Preliminary Statement) and, therefore, all claims
against that defendant are dismissed.

plaintiff was placed in the "NuWay," a substance abuse program operated by defendant CMS. (Id. at ¶¶ 22-23, 25.)  One aspect of the NuWay program was that participants, also called "family members," were permitted to engage other family members in sessions called "encounter groups."  (Transcript of Deposition of Timothy Baker dated August 10, 2004 ("Baker Dep.") at 94-98.)  Encounter groups were designed to allow family members to address issues with one another without threats of violence or "character assassination."  (Id. at 97:23-98:5.)  All of the NuWay counselors, namely defendants Jenkins, Thomas, Evans, Holmes and Schroeder, were present during encounter groups.  (Id. at 98:16.)

Each NuWay family member was assigned a designation or job.  (Id. at 94:5-11.) Plaintiff was appointed "Coordinator "Trainee" after only six weeks of involvement with the program.  (Id. at 93:7-25.)  Coordinator Trainee position is a paid position that entailed addressing other family members' negative behavior.  (Id. at 111:4-9.)  Plaintiff stated that his assignment to Coordinator Trainee created resentment by other more senior family members. (Id. at 93:7-25.)

**B.  Evidence of Threats**

In his role as Coordinator Trainee, plaintiff addressed negative behavior of another NuWay family member, defendant Abdul Samad, after he was late to a duty to which he was assigned through the program.  (Id. at 96:21.)  Plaintiff claims that defendant Samad responded by threatening him.  (Id. at 93:2-6.)  He stated defendant Samad initiated an encounter group in December of 2001 in which he "verbally bashed" plaintiff.  (Id. at 96:25-97:14.)  During a second encounter group in January of 2002, plaintiff claims defendant Samad intimidated him by disparaging his family and describing an assault on an inmate in another prison.  (Id. at 107:9-

108:18.)  Defendant Samad initiated a third encounter group in January of 2002 during which he

allegedly communicated the same intimidating message.  (Id. at 112:23-113:24.)  According to

the plaintiff, Samad stated he felt like hitting a particular family member in the head while

looking directly at plaintiff.  (Id. at 119:6-10.)  Plaintiff stated that all NuWay coordinators were

present at the encounter groups and that defendant Jenkins, the encounter group facilitator,

intervened to "correct" defendant Samad when he said things that were afield of the program's

intent.  (See id. at 100:18-101:1; 109:7-12; 114:3-11.)

###### C.    Notice to the Defendants

Plaintiff reported what he perceived as threats to the NuWay coordinators and prison

authorities.  He met with defendant Jenkins and requested to be relieved of his duties as

Coordinator Trainee, which she denied.  (Id. at 110:4-21.)  He stated that when defendant Samad

threatened another family member, he bypassed the reporting protocol and met with defendant

Daniel Schroeder, a CMS Substance Abuse Counselor.  (Id. at 119:9-12.)  He testified:

> I . . . asked [defendant Schroeder] what was he going to do about
> [the threat].  That is when he laughed and said, "Well, you ought to
> be able to talk to [defendant Samad] because you are the
> coordinator trainee.  You got to be able to deal with some things."
>
>      I said there was no talking to this guy because he's out to
> get me.  I said being you are the counselor, you should be the one
> dealing with this now because according to the coordinator rules,
> there will be no threats of violence or physical violence.  That is
> the number one cardinal rule on the top of the list, but he just
> laughed and didn't take it seriously at all.

(Id. at 119:6-25.)

Plaintiff then met with defendants Jenkins and Manigault.  (Id. at 121:1-17.)  Plaintiff

told them defendant Schroeder did not take his complaint seriously and advised that, as

Coordinator Trainee, plaintiff should deal with defendant Samad.  (Id. at 121: 18-122:9.)

According to the plaintiff, defendant Jenkins advised him that if he resigned as Coordinator

Trainee, he would be punished and expelled from the program.  (Id. at 121:12-19.)  He sated that

he had a parole review coming up and that the parole board advised him completion of the

NuWay program was required for eligibility.  (Id. at 122:20-123:1; 123:14-20.)  Defendant

Dutton testified that if an inmate reports a problem to CMS personnel, they are supposed to in

turn advise corrections officials.  (Dutton Dep. at 16:17-17:14.)  He further testified he did not

recall whether or not anyone from CMS advised him of plaintiff's complaints.  (Id. at 34:20-

35:10.)

     After meeting with defendants Jenkins and Manigault, plaintiff spoke to defendant

Sergeant Dutton in February 2002.  He reported threats made to him by defendant Samad and by

a corrections officer, defendant Inetha Allen.  Plaintiff stated that defendant Dutton seemed more

concerned about Allen's threats than Samad's.  (Id. at 133:16-19.)  Plaintiff stated that defendant

Allen harassed and threatened him and the four other "structure members" of NuWay because

she said they did not have the right to tell other inmates what to do.  (Id. at 131:7-17.)  Defendant

Dutton testified that he was aware of disciplinary issues with defendant Allen relating to

insubordination (Transcript of Deposition of Officer Louis Dutton ("Dutton Dep.") at 22:8-23),

favoritism toward certain inmates (id. at 23:17-24:5; 31:21-32:4), and conflicts with NuWay

counselors (id. at 24:18-26:4).

     With regard to defendant Samad, defendant Dutton advised plaintiff that threats by

NuWay participants were not likely to be carried out because they are close to being released.

(Baker Dep. at 130:7-21; 131:2-6.)  Although defendant Dutton stated in his deposition that he

was unaware of Samad's threats (Dutton Dep. at 32:23-33:1), he certified that he does not recall whether or not the meeting with plaintiff ever occurred or whether or not he was advised of problems between plaintiff and defendant Samad (Dutton Cert. at ¶ 5).

Plaintiff stated that, about two weeks after the meeting with Sergeant Dutton, Officer Allen told his cellmate, a Mr. Perry, that she was switching him for another prisoner – a bully whom she had to move several times. (Baker Dep. at 135:13-136:5.) That day, defendant Allen moved defendant Samad into plaintiff's cell. (Id. at 135:4-10.) Plaintiff stated he advised Officer Allen of the previous threats and did not feel comfortable with defendant Samad as a cellmate, and she told him to "deal with it." (Id. at 136:8-14.) Plaintiff stated he then asked to speak with a housing sergeant and was denied access and told that he and the other structure members were going to get what they deserved. (Id. at 136:15-23.)

Plaintiff stated that the Department of Corrections generally controlled where prisoners were placed. (Id. at 137:22-138:9.) He stated that CMS was not in control of the cells in which prisoners were placed but was aware that defendant Samad had become his cellmate. (Id. at 137:12-21.) NuWay counselors were permitted to make suggestions to the corrections officers as to the placement of inmates based on the needs of the NuWay program. (Dutton Dep. at 18:7-24.)

Defendant Dutton was responsible for cell assignment decisions. (Id. at 18:15-17.) Corrections officers were allowed to reassign inmates based on the counseling needs of the NuWay program but never with respect to "problem inmates." (Id. at 18:17-24.) Where corrections officers made reassignment decisions, they were submitted to Dutton for approval. (Id. at 19:7-10.) Dutton testified that Samad's move to plaintiff's cell would have come before

6

him for approval, but he could not recall whether or not he actually approved the reassignment.

(Id. at 26:18-27:5.)

### D.    The March 1, 2002 Assault

At 5:35 p.m. on March 1, 2002, plaintiff along with about 124 other inmates attended a

NuWay group meeting on the main floor of the prison.  (Baker Dep. at 166:17-167:18.)  At the

outset of the meeting, defendant Samad struck plaintiff in the head with a padlock in a sock.  (Id.

at 168:20-174:19.)  As a result of this incident, plaintiff received four stitches on his right temple

(id. at 170:171-5) and a concussion (id. at 183:8-14).  Plaintiff stated these injuries caused

headaches, impaired vision, decreased comprehension ability, memory loss, nightmares,

twitching in his right eye and index finger, and paranoia.  (Id. at 193:12-194:16; 199:4-19.)

Plaintiff stated he is unable to write songs and poetry as well as he once did and is not as

motivated as he once was.  (Id. at 199:20-200:11.)

### E.    Plaintiff's Efforts to Exhaust Administrative Remedies

Upon admission to the New Jersey State prison system, plaintiff was given an inmate

handbook that explains how to submit written grievances, inmate request forms, and other forms.

(Baker Dep. at 138:1-141:24.)  Mr. Baker stated there was a box available on his unit floor for

placement of grievance and request forms.  (Id. at 138:1-141:24.)  Before the March 1, 2002

assault, plaintiff stated he never filed an inmate request or grievance form with respect to Mr.

Samad's threats.  (Id. at 142:12-23.)  Plaintiff testified he

> never filed any type of request or grievance until after the incident
> took place, but I did write statements explaining to my counselors
> and I did make it clear to Sergeant Dutton what was going on with
> my situation.

(Id. at 142:23-143:3.)

Plaintiff stated that, shortly after the incident, he wrote out a statement describing the incident and requesting that charges be pressed against defendant Samad, and he was interviewed by a Mr. Soltyz from "IA." (Id. at 149:11-150:3.) He further stated that he sent request forms to prison administrators Ms. Balincki, Mr. Nunn, and Mrs. MacFarland. (Id. at 147:8-9, 219:19-223:20.) Plaintiff stated that in his request form to Mrs. MacFarland he explained the incident. (Id. at 221:2-3; 221:13-19.) He stated that in his request form to Ms. Balincki, he explained the incident, requested to be out of the NuWay program, and requested the opportunity to go on a work-release program. (Id. at 221:6-12; 222:5-10.) Plaintiff stated these requests went unanswered. (Id. at 222:11-13.) He stated he did not speak with anyone else in the DOC, but went through the "proper protocol" by writing these requests. (Id. at 224:24-225:3.)

F.     Plaintiff's Claims

Plaintiff initiated this action in May of 2003 [Docket Entry No. 1], and filed his Third Amended Complaint on October 18, 2004 [Docket Entry No. 56]. Plaintiff alleges defendants Inetha Allen, as well as the moving defendants Dutton, Schroeder, Jenkins, Manigault, and CMS, violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution and seeks recovery under 42 U.S.C. §§ 1983 and 1988[2]. (Complt. at ¶¶ 30-35, Count One.) Plaintiff claims the CMS Defendants were deliberately indifferent to his rights under the New Jersey State and United States constitutions. (Id. at ¶¶ 36-48, Count Two.)

---

[2]42 U.S.C. § 1988 gives the district court discretion to award the "prevailing party" in a Section 1983 case attorney's and expert's fees. To the extent the Court grants summary judgment in favor of the defendants on plaintiff's Section 1983 claims, summary judgment is also proper on his corresponding Section 1988 claims, as he cannot be a "prevailing party" on the underlying 1983 claim.

Plaintiff also claims the DOC Defendants were deliberately indifferent to his rights under the New Jersey State and United States constitutions.  (Id. at ¶¶ 49-58, Count Three.)  Plaintiff asserts a claim against defendant Samad for injuries he sustained during the March 1, 2002 assault.  (Id. at ¶¶ 59-61, Count Four.)  Plaintiff asserts a negligence claim against defendants Allen, Dutton, the CMS Defendants, and the DOC Defendants.  (Id. at ¶¶ 62-70, Count Five.)  He asserts a professional negligence claim against the CMS Defendants.  (Id. at ¶¶ 71-73, Count Six.)  Plaintiff further asserts claims that the CMS Defendants maintained improper policies in connection with the NuWay program, and failed to act appropriately, resulting in a violation of his Eight and Fourteenth Amendment rights.  (Id. at ¶¶ 74-78, Count Seven.)  Plaintiff asserts a claim against the DOC Defendants and Dutton for failing to take reasonable measures to insure his safety in violation of the Eighth and Fourteenth Amendments.  (Id. at ¶¶ 79-82, Count Eight.)  Finally, plaintiff asserts claims against all defendants for assault and battery, intentional infliction of emotional distress, negligence, violation of the New Jersey State Constitution.  (Id. at ¶¶ 83-85, Count Nine.)

The CMS Defendants, the DOC Defendants, and defendant Dutton now move for summary judgment and to dismiss plaintiff's claims against them.

## II.      DISCUSSION

### A.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted if the materials submitted to the Court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986); Lang v. New York Life Ins. Co., 721 F.2d

118, 119 (3d Cir. 1983).  Where the facts are not in dispute and the issues contested in a summary judgment motion are legal issues, the Court may decide the legal issues and rule accordingly on the summary judgment motion.  See Ingram v. County of Bucks, 144 F.3d 265, 267 (3d Cir. 1998) (when there is no genuine issue of material fact in dispute and the issue facing the court is a question of law, it can properly be resolved on summary judgment).  The existence of a "mere scintilla of evidence in support of [a] nonmovant's position will be insufficient" to withstand a summary judgment motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In determining whether more than a scintilla is extant, a court must "not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder."  Boyle v. County of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998).

**B.     Clearly Defined Constitutional Right**

Plaintiff asserts claims pursuant to 42 U.S.C. § 1983 for violation of his Eighth and Fourteenth Amendment rights.  A plaintiff may establish a Section 1983 by showing that (1) a person acting under color of state law (2) deprived the plaintiff of rights secured by the United States Constitution or laws of the United States.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).  Analysis of a Section 1983 claim begins by identifying the contours of the right said to have been violated and then determining "whether the plaintiff has alleged a deprivation of a constitutional right at all."  A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 579 (3d Cir. 2004) (quoting Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) and County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).  The Court will first discuss the contours of plaintiff's rights under the Eighth and Fourteenth Amendments, then turn to the defendants' motions.

i.    **Eighth Amendment**

Plaintiff had a clearly defined constitutional right to be free from cruel and unusual punishment under the Eighth Amendment.  The Eight Amendment imposes duties on prison officials to provide prisoners humane conditions of confinement, adequate food, clothing, shelter, medical care, and they must "take reasonable measures to guarantee the safety of the inmates." Helling v. McKinney, 509 U.S. 25, 31-32 (1993).  Prison officials violate the Eighth Amendment for failure to adequately protect a prisoner only where (1) the alleged deprivation is objectively "sufficiently serious," or, stated differently, the inmate is incarcerated under conditions posing a "substantial risk of serious harm;" and (2) the prison official knew of and was "deliberately indifferent" to such risk.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  "Deliberate indifference" in medical treatment, prison conditions, and failure to protect claims means that the official actually knew of "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  Id. at 847. Thus,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837.  A claim for inadequate medical treatment under the Eighth Amendment, requires proof of conduct was so cruel or unusual that it "shocks the conscience."  Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).  Even a finding of medical malpractice does not necessarily rise to the level of "deliberate indifference to a serious medical need" required to assert a Section 1983 claim.  Id. at 107.

11

ii.      **Fourteenth Amendment**

Plaintiff also had a clearly defined liberty interest, pursuant to the Fourteenth

Amendment, in being free from attack by a fellow prisoner.  The Supreme Court has observed

that prison administrators "are under an obligation to take reasonable measures to guarantee the

safety of the inmates themselves."  Hudson v. Palmer, 468 U.S. 517, 526-27 (1984).  Liability

under Section 1983 may be imposed on prison officials when a plaintiff has been assaulted by

another prisoner if there was "intentional conduct, deliberate or reckless indifference to the

prisoner's safety, or callous disregard on the part of prison officials."  Davidson v. O'Lone, 752

F.2d 817, 828 (3d Cir. 1984) (en banc) (citations omitted) aff'd sub nom. Davidson v. Cannon,

474 U.S. 344 (1986); see also Wade v. Haynes, 663 F.2d 778, 780-81 (8th Cir. 1981), aff'd on

other grounds sub nom. Smith v. Wade, 461 U.S. 30 (1983) (verdict sustained against

correctional officers and the superintendent of the reformatory for placing the prisoner in a

dangerous situation in which it was highly foreseeable that the assault would occur); Holmes v.

Goldin, 615 F.2d 83, 85 (2d Cir.1980) (prisoner assaulted by another prisoner entitled to an

opportunity "to show purposeful acts on the part of the correction officers or deliberate

indifference to his safety amounting to a violation of due process.")  A plaintiff seeking to

recover under the Fourteenth Amendment for a prison official's failure to protect must satisfy the

same "deliberate indifference" standard employed under an Eighth Amendment, as discussed

above.  A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center, 372 F.3d 572, 584 (3d

Cir. 2004).

In Davidson v. Cannon, 474 U.S. 344 (1986), the Supreme Court held the mere

negligence of a state official cannot result in a deprivation under the Due Process Clause of the

Fourteenth Amendment.  There, a prisoner who was threatened by a fellow prisoner submitted a note to prison administrators, one of whom underestimated the threat and the other forgot to read the note, and was later attacked by the inmate who threatened him.  474 U.S. at 345-46.  The Supreme Court held the type of governmental conduct at issue – "respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note" – was not the intentional conduct intended to be governed by the Due Process Clause. Id. at 347-48 (holding "the lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent.").

      C.      **The CMS Defendants' Motion**

Plaintiff asserts claims against the CMS Defendants for deliberate indifference in violation of the New Jersey State and United States constitutions (Third Amend. Complt. at ¶¶ 30-35, Count One; ¶¶ 36-48, Count Two); negligence (id. at ¶¶ 62-70, Count Five) and "professional negligence" (id. at ¶¶ 71-73, Count Six); maintaining improper policies in connection with the NuWay program, and failing to act appropriately in a violation of his Eighth and Fourteenth Amendment rights (id. at ¶¶ 74-78, Count Seven); and for assault and battery, intentional infliction of emotional distress, negligence, violation of the New Jersey State Constitution.  (Id. at ¶¶ 83-85, Count Nine.)

The CMS Defendants move to dismiss plaintiff's claims, arguing (1) plaintiff cannot establish "deliberate indifference" (CMS Defendants' Br. at 25-29); (2) plaintiff cannot establish deprivation of a constitutional right under Estelle v. Gamble, 429 U.S. 97 (1976) (id. at 29-32); (3) the CMS Defendants cannot be held vicariously liable under Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978) (id. at 32-35); (4) plaintiff failed to exhaust administrative

13

remedies pursuant to 42 U.S.C. § 1997e(a) (id. at 35-36); and (5) plaintiff cannot establish

negligence (id. at 36-39).

### i.    Administrative Remedies

The CMS Defendants move to dismiss plaintiff's claims for failure to exhaust

administrative remedies under the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C.

§ 1997e(a).  (CMS's Brief at 35-36.)  They argue that plaintiff failed to submit an inmate request

or grievance form, the process for which is outlined in an inmate handbook that he received.  (Id.

at 36.)  In his opposition, plaintiff argues (1) his claims against the CMS Defendants are not

subject to the PLRA exhaustion requirements (Opp. Br. at 51); (2) he followed what he

understood CMS's grievance procedures to be by reporting what he perceived as threats to

NuWay counselors (id. at 53); (3) he was denied access to a housing officer when defendant

Samad was placed in his cell (id. at 53-54); (4) there were "frequently no inmate grievance forms

available for the prisoners" (id. at 54); (5) plaintiff's claims do not related to "prison conditions"

and, therefore, are not subject to the PLRA's exhaustion requirements (id.); (6) plaintiff could

not recover money damages through the grievance process and, therefore, it does not apply to his

claims (id. at 55); and (7) the PLRA exhaustion requirement does not apply to his state claims

(id. at 56.)

The PLRA provides in relevant part:

> [n]o action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  The Supreme Court has stated "the PLRA's exhaustion requirement

applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).   Citing Porter, the Court of Appeals for the Third Circuit has interpreted the language "with respect to prison conditions" broadly to include any action arising from "the effects of actions by government officials on the lives of persons confined in prison." Booth v. Churner, 206 F.3d 289, 294-95 (3d Cir. 2000) (holding a prisoner's excessive force claims related to a "prison condition" and were dismissed under Section 1997e(a) for failure to exhaust administrative remedies).  In Booth, the court read Section 1997e(a) to require exhaustion of administrative remedies in:

> civil actions ranging from excessive force actions, . . . to actions "with respect to" a prison official's decision not to make basic repairs in the prison, or intentionally to deny a prisoner food, heating, or medical attention.  All of these actions affect the lives of prisoners similarly:  They make their lives worse.

206 F.3d at 295.  Because plaintiff's claims about defendants' failure to protect him from another prisoner and failure to supply adequate medical treatment "concern everyday aspects of an inmate's life in prison," they involve "prison conditions" within the meaning of PLRA and are subject to the exhaustion requirement.  See Dawud v. Talasnik, No. Civ. 04-1015, 2005 WL 1881026, at *6 (D.N.J. Aug. 4, 2005) (holding "[c]omplaints that corrections officers failed to protect an inmate from another prisoner involve 'prison conditions' within the meaning of PLRA because they "concern everyday aspects of an inmate's life in prison.").  Therefore, the Court rejects plaintiff's argument that his claims do not relate to "prison conditions" under the PLRA.

The Court further finds that the PLRA applies with respect to plaintiff's Section 1983

15

claims against CMS.  The language "[n]o action shall be brought . . . under section 1983 of this

title . . . until such administrative remedies as are available are exhausted" cannot reasonably be

read to except private correctional medical services providers.  Indeed, even private entities like

CMS are considered state actors under Section 1983.  See West v. Atkins, 487 U.S. 42, 54 (1988)

(holding a physician is considered a state actor when the physician is under contract to provide

medical services to prisoners); Christy v. Robinson, 216 F. Supp. 2d 398, 412 n.26 (D.N.J. 2002)

(citing West and finding CMS to have been a state actor for the purpose of the plaintiff prisoner's

Eighth Amendment claim); Ford v. Prison Health Servs., Civ. A. No. 90-7253, 1991 WL

137022, at *1 (E.D. Pa. July 17, 1991) (holding that a physician is considered a state actor when

the physician worked for Prison Health Services, a company under contract with the state to

provide medical services to prisoners).  In particular, Courts within this Circuit have recognized

that the exhaustion requirement applies to Section 1983 claims against CMS.  See, e.g., Frink v.

Williams, No. CIV.A.04-026, 2005 WL 2346891, at *2 (D. Del. Sept. 26, 2005) (dismissing

prisoner's claim that CMS failed to provide him adequate medical care for failure to exhaust

administrative remedies); Christy, 216 F. Supp. 2d at 412 n.26; Baker v. Williams, No.

CIV.A.01-471, 2002 WL 31015630, *3 (D. Del. Sep. 10, 2002) (applying Section 1997e(a)

analysis to prisoner's claims against CMS).  In this case, plaintiff claims the CMS Defendant

administered the NuWay program that created a condition of prison life that caused plaintiff

harm.  Accordingly, the Court is satisfied that Section 1997e(a) applies to CMS.

　　　　The Court must next determine whether or not plaintiff's conduct in this case satisfied

Section 1997e(a).  Plaintiff did not file an inmate request form or an inmate grievance form

before the March 1, 2002 incident.  (Baker Dep. at 90:25-91:12.)  Plaintiff testified, however,

that shortly after the incident, he submitted three separate request forms to prison administrators describing the incident and requesting, for example, the opportunity to participate in a work-release program (Baker Dep. at 221:6-12; 222:5-10) and that these requests went unanswered (id. at 222:11-13).  The movants have not demonstrated that these efforts to employ the grievance process are insufficient as a matter of law.  The CMS Defendants have further failed to describe what, if any, grievance procedures were in place that were specific to the NuWay program.  Accordingly, the Court has no way to tell whether or not his conversations with NuWay counselors satisfied any such policies.  The CMS Defendants' motion to dismiss plaintiff's claims for failure to exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a) is, therefore, denied.

### ii.       Deliberate Indifference to a Serious Medical Need

Plaintiff asserts in his brief that he was denied any medical treatment "by a physician" for a period of five days following the March 1, 2002 incident.  (Opp. Br. at 49-50.)  Immediately following the March 1, 2002 incident, however, plaintiff was treated by a registered nurse and a nurse practitioner.  He was evaluated, x-rays were taken, and he was given sutures.  (McClain Cert., Exh. B at 29-33.)  Plaintiff was evaluated numerous times on March 1 and 2, 2002 by a registered nurse and given neurological exam, at which point he stated he felt better.  (Id., Exh. B at 34-36.)  Plaintiff was evaluated and given another x-ray on March 4, 2002, which was negative.  (Id., Exh. B at 37-38.)  Plaintiff was again evaluated by a nurse practitioner on March 6, 2002.  (Id., Exh. B at 38-41.)  Plaintiff points to no evidence, besides his own assertion, that this treatment was inadequate.  Indeed, he concedes that he "is not alleging that he received inappropriate care," but merely that he was not evaluated by a "physician."  (Opp. Br. at 49.)

17

Plaintiff's medical claim under the Eighth Amendment appears to rely solely on the fact he did not see a "physician" for the five days following the assault.  Plaintiff does not provide evidence that his symptomology immediately following the assault alerted the CMS Defendants of a serious medical need that could only be addressed by a physician.  He further does not claim that the medical attention he did receive was inappropriate, or that his injuries were exacerbated by the delay in seeing a physician.  At this stage of the litigation, plaintiff is required to evince more than a mere scintilla of evidence, Anderson, 477 U.S. at 252, which he has failed to do, and his mere dissatisfaction with the care he received is insufficient, Monmouth County Corr. Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).  Moreover, plaintiff's concession that the care he received was not inappropriate and his contention that the same treatment "shocks the conscience," see Estelle v. Gamble, 429 U.S. at 105-06, are irreconcilable. Accordingly, summary judgment on plaintiff's Eighth Amendment medical treatment claim is appropriate.

### iii.    Failure to Protect

Plaintiff further asserts a claim against the CMS Defendants for failure to protect him from a known risk.  Plaintiff testified that all NuWay counselors were present during encounter groups (Baker Dep. at 98:16), which is where Samad's threats occurred.  He specifically testified they observed defendant Samad threaten him.  (Baker Dep. at 100:18-101:1; 109:7-12; 114:3-11.)  Moreover, plaintiff met individually with several counselors in the NuWay program, including defendants Jenkins (id. at 110:4-21; 121:1-17), Schroeder (id. at 119:9-12); and Manigault (121:1-17), told them about Samad's threats, and asked to be relieved from his duties as Coordinator Trainee.  Plaintiff stated defendant Jenkins told him there would be consequences

if he resigned.  (Id. at 121:12-19.)  Accordingly, the Court is satisfied that there is an issue of fact

as to whether or not the CMS Defendants were on sufficient notice of a risk to plaintiff and

disregarded that risk.

Moreover, while plaintiff concedes CMS Defendants are not in charge of cell assignment

(id. at 137:12-138:9) defendant Dutton stated that CMS personnel were permitted to make

suggestions based on observations from the NuWay program (Dutton Dep. at 18:7-24).  Indeed,

common sense dictates that, had the CMS Defendants been aware of a situation between two

inmates that would put one or both of them at risk of physical harm, they should advise prison

officials to ensure against such harm.  The Court further notes that the alleged multiple threats by

defendant Samad and the March 1, 2002 assault both occurred at NuWay meetings, under the

supervision of the individual CMS Defendants.  For all of these reasons, the Court cannot hold

that the individual CMS Defendants are entitled to summary judgment on plaintiff's

constitutional claims against them.

### iv.    CMS Inc.'s Lack of Adequate Policies

CMS Inc. cannot be held responsible for the acts of its employees under a theory of

respondeat superior or vicarious liability.  See Monell v. New York City Dept. of Soc. Servs.,

436 U.S. 658, 691 (1978); Natale v. Camden County Corr. Facility, 318 F.3d 575, 583-84 (3d

Cir. 2003).  Rather, plaintiff must provide evidence that "there was a relevant [CMS] policy or

custom, and that the policy caused the constitutional violation [he] allege[s]."  Natale, 318 F.3d

at 584 (citing Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397,

404 (1997)).  The Court of Appeals for the Third Circuit has explained the terms "custom" and

"policy" as follows:

> A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)).  A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bryan County, 520 U.S. at 404.

Natale, 318 F.3d at 584.  A government employee's acts may be deemed a "custom" or "policy" of its employer where (1) an officer of the employer "promulgates a generally applicable statement of policy and the subsequent act . . . is simply an implementation of that policy;" (2) federal law has been violated by an act of the policymaker; or (3) the policymaker has failed to act in the face of a need to take control of its agents so obvious "that the policymaker can reasonably be said to have been deliberately indifferent to the need."  Id. (citations omitted).

In Natale, for example, the Court of Appeals for the Third Circuit held that a detainee established an issue of fact as to whether or not a third-party medical services provider, PHS, had a policy or custom that violated his constitutional rights.  Natale, an insulin-dependent diabetic, sued PHS for violation of his Eighth Amendment rights when he suffered a stroke due to PHS's failure to administer insulin during the first twenty-one hours of his incarceration.  318 F.3d at 578.  The court found an issue of material fact, noting testimony that PHS could not administer medication without a doctor's order, there was no requirement that a doctor see an inmate within 72 hours of his admittance, and no one was charged with determining whether an inmate should be seen earlier.  Id. at 584-85.  Based on this evidence, the court held "[a] reasonable juror could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute

20

deliberate indifference to those inmates' needs." Id.  Accordingly, the Third Circuit reversed the district court's grant of summary judgment.

Although plaintiff has established an issue of fact as to whether or not the NuWay counselors violated his constitutional rights, he has not shown any evidence that their conduct amounts to a policy or custom of CMS Inc.  Nor has he shown evidence, nor does he allege, that their conduct violated federal law.  And the Court finds no evidence of some overt, ongoing condition of threats of violence that have been carried out among NuWay family members, and that CMS Inc. failed implemented a reporting protocol regarding such threats sufficient to support a finding of deliberate indifference on its part.  Moreover, unlike Natale, there is no evidence of a practice of CMS Inc. of denying medical attention by a physician for more than five days.  Incidentally, the Court has found that any delay in supplying plaintiff with medical service by a physician did not amount to the deprivation of a constitutional right.  For all of these reasons, summary judgment is appropriate as to plaintiff's claims against CMS Inc.

> **v.     Negligence and "Professional Negligence"**

In New Jersey, a claim for professional malpractice requires plaintiff to show, through expert testimony, that the defendant deviated from the relevant professional duty.  See Rosenberg v. Cahill, 99 N.J. 318, 325 (1985).  Thus, in the typical malpractice case, the "the standard of practice to which the defendant-practitioner failed to adhere[,] must be established by expert testimony."  Natale, 318 F.3d at 579 (quoting Rosenberg, 99 N.J. at 325).  Plaintiff argues the "common knowledge" exception to the requirement of expert testimony in professional malpractice cases applies here.

Plaintiff argues his negligence claims do not require expert testimony because "the fact

that . . . [plaintiff] was denied any treatment whatsoever by a physician for five days after his assault, makes expert testimony unnecessary."  (Pl.'s Br. at 49.)  Where "the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts," Estate of Chin v. Saint Barnabas Med. Ctr., 160 N.J. 454, 468 (1999), "the jury itself is allowed 'to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto.'"  Rosenberg, 99 N.J. at 325 (quotations omitted).

The common knowledge exception is reserved for situations in which "the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." Estate of Chin, 160 N.J. at 469-470 (quoting Rosenberg, 492 A.2d at 375); see, e.g., Sanzari v. Rosenfeld, 34 N.J. 128, 143 (1961) (allowing doctrine of common knowledge where dentist caused patient's death by administering anesthesia without inquiring into history of hypertension); Tramutola v. Bortone, 118 N.J. Super. 503, 512-13 (App. Div. 1972) (holding expert not required where physician failed to inform patient of needle left in patient's body after medical procedure); Becker v. Eisenstodt, 60 N.J. Super. 240, 245-47 (App. Div. 1960) (ruling that common knowledge was sufficient to determine malpractice in case where physician applied caustic liquid in treating patient after rhinoplasty, thereby severely disfiguring her); Steinke v. Bell, 32 N.J. Super. 67, 70 (App. Div. 1954) (holding that expert evidence not required in malpractice case where dentist extracted wrong tooth).

Plaintiff cannot avoid the expert evidence requirement by stating that he was not treated by a physician for five days following the May 1, 2002 assault.  As explained supra, plaintiff received continuous medical attention commencing immediately after the March 1, 2002 assault.

22

Plaintiff's theory that he was denied adequate medical attention by a physician would require, at

a minimum, a determination of the extent of his injuries based on a review of his medical records

and testimony, an opinion as to the generally accepted standard of medical treatment required to

treat such injuries, and an evaluation of the treatment that plaintiff received to determine whether

or not defendants met the generally accepted standard.  The Court does not regard these matters

as readily apparent to anyone of average intelligence and ordinary experience and, therefore,

rejects plaintiff's argument that the common knowledge exception applies.  Given that plaintiff

has evinced no expert testimony regarding the standard of professional care to be applied in this

case, summary judgment on his negligence claims is appropriate.

### D.      The DOC Defendants' Motion

Plaintiff asserts claims against the DOC Defendants for deliberate indifference to his

rights under the New Jersey State and United States constitutions (Third Amend. Complt. at ¶¶

30-35 Count One;¶¶ 49-58, Count Three; ¶¶ 79-82, Count Eight); negligence (id. at ¶¶ 62-70,

Count Five); and claims of assault and battery, intentional infliction of emotional distress,

negligence, and violation of the New Jersey State Constitution.  (Id. at ¶¶ 83-85, Count Nine.)

The DOC Defendants move for summary judgment on plaintiff's claims against them

because (1) defendants Maurer, and Nunn had no personal involvement in the events that

plaintiff claims led to his injury (DOC Br. at 14-20); all of the DOC Defendants are entitled to

qualified immunity (id. at 21-30); and (3) the DOC Defendants are entitled to absolute immunity

under N.J.S.A. 59:5-2 (id. at 30-33).

### i.      Knowledge Requirement

To proceed on a Section 1983 claim for violation of plaintiff's Eighth and Fourteenth

Amendment rights, plaintiff must show knowledge on the part of the defendants that amounts to "deliberate indifference." See Farmer, 511 U.S. at 837 (holding in an Eighth Amendment case that plaintiff must show that the official was "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); A.M., 372 F.3d at 584 (applying the Eighth Amendment's "deliberate indifference" standard to claims of failure to protect under the under the Fourteenth Amendment by an inmate against prison officials).

Plaintiff's arguments that Defendants Maurer and Nunn were deliberately indifferent to the known risk of harm are without support in the record. Indeed, the Court sees no evidence that either defendant Maurer or Nunn received notice of any situation between plaintiff and defendant Samad before the March 1, 2002 assault. Plaintiff concedes that he did not submit a grievance form before the assault to either Defendant Maurer or Nunn, and they flatly deny any such knowledge. Moreover, there was no history of violence between the two that would sufficiently put them on notice that measures should have been taken to protect the plaintiff. The Court has not been presented with any caselaw that imputes knowledge upon prison administrators because an officer or contractor may have been put on notice of a potential issue. Rather, the law requires that a defendant in a Section 1983 case personally know of and disregard a serious risk to plaintiff's health or safety. Farmer, supra, 511 U.S. at 834; see also Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976) (dismissing claims against prison warden, finding "there is not the slightest evidence showing that the warden had actual knowledge of the unanswered request for medical attention or that he acquiesced or participated in any denial"). Since there is no evidence that Nunn and Maurer knew of a risk to the plaintiff,

summary judgment on plaintiff's constitutional claims against them is appropriate.

      **ii.**   **Vicarious Liability**

Nor can plaintiff's constitutional claims against defendants Nunn and Maurer proceed under a theory of respondeat superior liability.  It is well settled that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellaciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  The Court of Appeals for the Third Circuit has stated:

> It is clear from . . . [Section 1983's] express language that, . . . a
> civil rights complaint must protray specific conduct by state
> officials which violates some constitutional right of the
> complainant in order to state a claim for relief.

Gittlemacker v. Prasse, 428 F.2d 1, 3 (3d Cir. 1970).  In short, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs" to be held liable. Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir. 2003) (quotations omitted).  Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Rode, 845 F.2d at 1207.

Here, plaintiff argues that Defendant Maurer, as acting Commissioner of the prison facility, had "overall responsibility for the operation of the prison." (Opp. at 59.)  Plaintiff argues she was responsible for the management of vendors, including CMS, and her failure to supervise CMS or to "establish some procedures that would enable prison officials to know what was going on within the operation fo the NuWay program" is sufficient involvement under Section 1983. (Id. at 59-60.)

These arguments amount to an impermissible attempt to obtain respondeat superior

liability against defendant Maurer.  Defendant Maurer, as Acting Commissioner of the DOC

from January 2001 to April 2002, was responsible for the overall management of the DOC.  It is

undisputed, however, that facility-level housing decisions were delegated to staff at the

individual institutions.  (Terhune Affidavit at ¶¶ 2-3, Maurer Affidavit at ¶¶ 2-3.)  Plaintiff never

put defendant Maurer on notice of the events alleged in this case.  (Baker Dep. at 219:17-21;

220:4-5.)  Defendant Maurer had no direct personal involvement in the alleged conduct, and

there is nothing before the Court that would demonstrate knowledge of Samad's threats or his

placement in plaintiff's cell.  Thus, there can be no actual knowledge and acquiescence on her

part.

Similarly, plaintiff argues that defendant Nunn, as prison administrator, "had overall

responsibility for the classification committee and participated as a member of the committee"

and, even if he denies making a decision to classify defendant Samad as eligible to be housed

with plaintiff, "the manner in which the classification committee was run . . . established Mr.

Nunn's personal involvement in the deprivation of Mr. Baker's constitutional rights."  (Id. at 61.)

The record presents no evidence that Defendant Nunn was directly involved in the alleged

constitutional deprivations.  Defendant Nunn maintains that he had no personal involvement in

placing Mr. Samad in plaintiff's cell because these decisions were delegated to a lieutenant.

(Nunn Aff. at ¶ 4.)  Defendant Nunn did not assign plaintiff or any other NuWay participant to

their cells, nor did he direct any prison staff members to initiate any housing assignments of

plaintiff or any of his cell mates.  (Id. at ¶ 6.)  Moreover, defendant Nunn was never informed of

plaintiff's alleged problems with Defendant Samad.  (Id. at ¶¶ 7-9; Deposition of Stanley Nunn

dated October 29, 2004 at 147:13-18; 152:18-21; Baker Dep. at 220:6-14.)

Notably, plaintiff tacitly acknowledges Defendants Maurer and Nunn's lack of involvement with Defendant Samad being placed in his plaintiff's cell when he argues that Defendant allen "sidestepped" the classification committee and placed Samad in his cell without approval or direction from these defendants.  (Opposition at 60.)  Accordingly, summary judgment is granted in favor of defendants Nunn and Maurer on Counts One, Three, and Eight of plaintiff's complaint.  Given its conclusions regarding plaintiff's Section 1983 claims against these defendants, the Court need not reach the DOC Defendants' qualified immunity arguments.

### iii.        Absolute Immunity Pursuant to N.J.S.A. 59:5-1

Defendants Maurer and Nunn further argue that summary judgment should be granted with regard to the remaining claims against them under N.J.S.A. 59:5-1 et seq.  The New Jersey Tort Claims Act effectively abrogates the doctrine of sovereign immunity and provides immunity for public entities unless liability is expressly allowed.  N.J.S.A. 59:5-2 governs claims of injury of an inmate by another inmate, and provides that "[n]either a public entity nor a public employee is liable for . . . a prisoner to any other prisoner."  Thus, absent some evidence that a particular defendant acted maliciously or fraudulently in placing Samad in plaintiff's cell, summary judgment is appropriate.  See Bona v. Wynn, 311 N.J. Super. 257, 272 (App. Div. 1997).  In this case, the record contains no such evidence with respect to Defendants Maurer and Nunn.  Accordingly, summary judgment is appropriate as to the balance of plaintiff's claims against these defendants.

### E.        Motion by Defendant Sergeant Lewis Dutton

Plaintiff asserts claims against Defendant Dutton for violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution (Complt. at ¶¶ 30-35,

Count One; ¶¶ 49-58, Count Three; and ¶¶ 79-82, Count Eight); negligence (id. at ¶¶ 62-70,

Count Five); and state claims for assault and battery, intentional infliction of emotional distress,

negligence, and violation of the New Jersey State Constitution (id. at ¶¶ 83-85, Count Nine).

Defendant Dutton moves for summary judgment, arguing (1) he is entitled to qualified immunity

(Dutton Br. at 9-14); and (2) plaintiff's state law claims are barred under a number of provisions

of the New Jersey Tort Claims Act (id. at 15-25).

### i.      The New Jersey Tort Claims Act

Given that plaintiff does not dispute that a notice of claim under the New Jersey Tort

Claims Act was never filed, the Court will address this argument first.  N.J.S.A. 59:8-3 states:

> No action shall be brought against a public entity or public
> employee under this act unless the claim upon which it is based
> shall have been presented in accordance with the procedure set
> forth in this chapter.

N.J.S.A. 59:8-3.  The form of notice required is embodied in N.J.S.A. 59:8-8, which states in

relevant part:

> A claim relating to a cause of action for death or for injury or
> damage to person or to property shall be presented . . . not later
> than the ninetieth day after accrual of the cause of action.
>                                    . . . .
> The claimant shall be forever barred from recovering against a
> public entity or public employee if:  a. He failed to file his claim
> with the public entity within 90 days of accrual of his claim except
> as otherwise provided in section 59:8-9. . . .

N.J.S.A. 59:8-8.  The 90-day period for filing a notice of tort claim may be extended to one year

only in extraordinary circumstances.  N.J.S.A. 59:8-9.  Strict compliance is required to satisfy the

Tort Claims Act, and the filing of a complaint is not a substitute for a notice of claim.  See

Guzman v. City of Perth Amboy, 214 N.J. Super. 167, 171-72 (App. Div. 1986); Reale v.

Township fo Wayne, 132 N.J. Super. 100, 110-12 (Law Div. 1975).

Here, plaintiff has not filed a notice of tort claims, timely or otherwise.  He has never moved before this Court to file a notice of tort claim out of time and his opposition presents no circumstances that would warrant such leave.  Because more than one year has elapsed since the accrual of plaintiff's cause of action, plaintiff could not cure the deficiency even upon showing extraordinary circumstances.  Accordingly, summary judgment in defendant Dutton's favor is appropriate on plaintiff's state claims embodied in Counts Five, Eight, and Nine of the Third Amended Complaint.[3]

Given its conclusions with respect to all of plaintiff's state claims, the Court need not address defendant Dutton's arguments under N.J.S.A. 59:5-1(b)(4) and N.J.S.A. 59:9-2(d).  The Court agrees with defendant Dutton that plaintiff may not recast his state court claims as

---

[3]Plaintiff has not argued that intentional torts are outside the ambit of the New Jersey Tort Claims Act.  In Velez v. City of Jersey City, 180 N.J. 284 (2004), the New Jersey Supreme Court held that even intentional tort claims require a notice of tort claim to be filed, but only applied the holding to actions accruing on or after June 29, 2004, the date of the opinion.  Whether or not the Tort Claims Act required notices of claims for plaintiff's intentional tort claims (which accrued on or about May 1, 2002), summary judgment is appropriate because plaintiff has not shown sufficient evidence of the intent required to sustain such claims.

Battery is "[a]ny non-consensual touching . . . ," Perna v. Pirozzi, 92 N.J. 446, 460-61 (1983), and requires proof that "the defendant intends a harmful contact, or an offensive contact, upon the plaintiff . . . (all of which are battery-type consequences) . . . [or] defendant intends only to cause apprehension that such a contact is imminent (an assault-type consequence)."  Kelly v. County of Monmouth, 380 N.J. Super. 552, 559 (App. Div. 2005) (quoting Prosser and Keeton, The Law of Torts (5th ed., 1984) § 9 at 39).  Intentional infliction of emotional distress requires proof that the defendant "intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct."  49 Prospect Street Tenants Ass'n v. Sheeva Gardens, Inc., 227 N.J. Super. 449, 474 (App. Div. 1988).  Each of these torts requires evidence of intent.  Because this Court has not been presented evidence of intent by Dutton to cause harmful contact to plaintiff, summary judgment on these claims is appropriate.  On this alternative basis, the Court dismisses plaintiff's intentional tort claims against defendant Dutton.

violations of the New Jersey State Constitution arising from the same conduct and thereby avoid

dismissal under the Tort Claims Act.  See B.F. v. DYFS, 296 N.J. Super. 372, 385 (App. Div.

1997).  The Court further notes that, had it reached the issue, it would have determined under an

analysis similar to that discussed supra with regard to the CMS Defendants, that Defendant

Dutton is immune under N.J.S.A. 59:9-2(d).  Plaintiff's state constitutional claims are, therefore,

dismissed to the extent they arise from the same set of facts as those state common law claims

that are barred by the Tort Claims Act.

### ii.     Qualified Immunity

The Court has already undertaken the first step of the qualified immunity analysis by

finding that plaintiff has asserted a violation of clearly established constitutional rights under the

Eighth and Fourteenth Amendments.  See, supra, at Part II.C.; Wright v. City of Philadelphia,

409 F.3d 595, 600, 601 (3d Cir. 2005) (holding that a court undertaking a qualified immunity

analysis must first determine whether or not plaintiff has established deprivation of a clearly

defined constitutional right).  The Court turns next to defendant Dutton's argument that he is

immune from action for the deprivation of such rights.

Defendant Dutton argues that he is entitled to qualified immunity with respect to the

constitutional claims against him embodied in Counts One and Eight of the Third Amended

Complaint.  Plaintiff argues defendant Dutton "acted with deliberate indifference to . . . [his]

repeated expressions of fear for his safety and even his live [sic]."  (Id. at 27.)  He argues Dutton

is responsible for allowing the assault by defendant Samad to take place.  (Id. at 28.)  Thus, he

argues, material issues of fact exist defeating summary judgment in favor of Defendant Dutton

on qualified immunity grounds.  (Id. at 35.)

Under the doctrine of qualified immunity, public officials are shielded from suit if their actions were objectively reasonable and not in violation of clearly established law.  Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  The Court of Appeals for the Third Circuit has stated that to overcome qualified immunity in a suit by a prisoner against prison officials for damages arising from an assault by another prisoner, the plaintiff must show "intentional conduct, deliberate or reckless indifference to the prisoner's safety, or callous disregard."  Davidson, 757 F.2d at 828.  "Where a person suffers injury as an incidental and unintended consequence of official actions, the abuse of power contemplated in the due process and eight amendment cases does not arise."  Id. at 827 (quoting Rhodes v. Robinson, 612 F.2d 766, 772 (3d Cir. 1979)).  In short, to overcome qualified immunity, plaintiff must show that defendant Dutton knew that plaintiff would be injured by Defendant Samad, or callously disregarded the likelihood of such injury.

Taking the facts of this case as a whole, the Court cannot grant summary judgment as to the defendant Dutton on qualified immunity grounds.  First, plaintiff stated he met with and told defendant Dutton about threats by Samad's and Allen.  (Baker Dep. at 133:16-19, 131:7-17.)  Plaintiff's told Dutton that Allen harassed and threatened him, along with four other NuWay "structure members," because she said they did not have the right to tell other inmates what to do.  (Baker Dep. at 131:7-17.)  Dutton stated he was aware of disciplinary issues with defendant Allen, including inmate favoritism (Dutton Dep. at 23:17-24:5; 31:21-32:4), and disagreement with the NuWay counselors concerning "what they were doing in regards to the NuWay program" (id. at 24:18-26:4).  While Dutton stated in his deposition that he was unaware of such threats (Dutton Dep. at 32:23-33:1), he did not recall whether or not the meeting with plaintiff

31

occurred (Dutton Cert. at ¶ 5).  There is, therefore an issue of fact as to whether or not defendant Dutton knew of a risk of harm to plaintiff by defendants Allen and Samad.

Moreover, defendant Dutton was responsible for cell assignment decisions.  (Dutton Dep. at 18:15-17.)  Even where corrections officers reassigned inmates on their own, such reassignments were submitted to him for approval.  (Id. at 19:7-10.)  Dutton could not recall whether or not he actually approved the reassignment but stated it would have come before him for approval.  (Id. at 26:18-27:5.)  Notably, plaintiff stated that defendant Allen described Samad as a bully whom she had to move several times.  (Baker Dep. at 135:13-136:5.)  A juror could find from these facts, and inferences drawn from them, that defendant Dutton knew of and unreasonably disregarded a serious risk to the plaintiff, leading to the violation of his constitutional rights.  At this point, therefore, viewing the facts in a light most favorable to the plaintiff, as the Court must, summary judgment as to defendant Dutton must be denied.

III.     **CONCLUSION**

For all of the foregoing reasons, the Court holds:

Plaintiff's claims against Defendant Turhune are **DISMISSED** with plaintiff's consent;

The CMS Defendants' Motion for Summary Judgment [Docket Entry No. 77] is

**GRANTED IN PART AND DENIED IN PART**, to wit:

a.     The CMS Defendants' motion for summary judgment on plaintiff's claims for

violations of the Eighth Amendment for deliberate indifference to a serious

medical need (Counts One, Two, and Seven) is **GRANTED**, and said claims

against them are **DISMISSED WITH PREJUDICE**;

b.     The CMS Defendants' motion for summary judgment on plaintiff's claims for

violations of the Eighth and Fourteenth Amendments for failure to protect

plaintiff from another inmate (Counts One, Two, and Seven) is **DENIED** as to

defendants Schroeder, Jenkins, Manigault, and Nugent; and **GRANTED** as to

defendant CMS Inc., and such claims against CMS Inc. are **DISMISSED WITH**

**PREJUDICE**; and

c.     The CMS Defendants' motion for summary judgment on plaintiff's

negligence/professional negligence claims (Counts Five and Six) is **GRANTED**,

and said claims against them are **DISMISSED WITH PREJUDICE**;

The DOC Defendants' Motion for Summary Judgment [Docket Entry No. 78] is

**GRANTED** and plaintiff's claims against them for violation of his rights under the Eighth and

Fourteenth Amendments to the United States Constitution (Counts One, Three, and Eight);

negligence (Count Five); and state claims for assault and battery, intentional infliction of

emotional distress, negligence, and violation of the New Jersey State Constitution (Count Nine)

are **DISMISSED WITH PREJUDICE**; and

Defendant Dutton's Motion for Summary Judgment [Docket Entry No. 80] is

**GRANTED IN PART AND DENIED IN PART**, to wit:

a.  Defendant Dutton's motion for summary judgment on plaintiff's negligence
(Count Five); and state claims for assault and battery, intentional infliction of
emotional distress, negligence, and violation of the New Jersey State Constitution
(Count Nine) is **GRANTED**, and said claims against him are **DISMISSED
WITH PREJUDICE**;

b.  Defendant Dutton's motion for summary judgment on plaintiff's claims for
violations of his rights under the Eighth and Fourteenth Amendments to the
United States Constitution (Counts One, Three, and Eight) is **DENIED**;

An appropriate Order will follow.

Date:   April 24, 2005

_____     /s/Stanley R. Chesler
                                             United States District Judge

34